# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

---

Nº 15-CV-849 (JFB)

---

JOSEPH MIRACOLO,

Plaintiff,

VERSUS

NANCY A. BERRYHILL,
ACTING COMMISSIONER OF SOCIAL SECURITY,

Defendant.

---

**MEMORANDUM AND ORDER**
February 26, 2018

---

JOSEPH F. BIANCO, District Judge:

Plaintiff Joseph Miracolo ("plaintiff") commenced this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) of the Social Security Act on February 18, 2015, challenging the final decision of the Acting Commissioner of Social Security (the "Commissioner") [1] denying plaintiff's application for Social Security disability benefits on December 23, 2014. (ECF No. 1; Administrative Record ("AR") at 2.) The Court remanded this case to the Commissioner, pursuant to the sixth sentence of 42 U.S.C. § 405(g), to consolidate plaintiff's claims for widow's insurance and disability insurance benefits, conduct a new hearing, and issue a new decision on the consolidated claims. (ECF No. 9.) On remand, plaintiff received a partially favorable decision: on February 24, 2016, he was found not to have been disabled prior to January 17, 2015, but to have been disabled as of that date. [2] (AR at 608, 620.) The

---

[1] Plaintiff commenced this action against Carolyn W. Colvin, who was then the Acting Commissioner of Social Security. Pursuant to Federal Rule of Civil Procedure 25(d), the Clerk of the Court is directed to substitute Nancy A. Berryhill, who now occupies that position, as defendant in this action.

[2] Applying Medical-Vocational Rule 202.06, the Administrative Law Judge ("ALJ") found that plaintiff was disabled as of January 17, 2015 because his age

Appeals Council affirmed this decision, which therefore stood as the Commissioner's final decision. (AR at 381.)

Plaintiff now challenges the unfavorable portion of the Commissioner's decision, finding that plaintiff was not disabled under the Social Security Act from March 5, 2012 through January 16, 2015. (ECF No. 17-1 at 1.) In particular, plaintiff challenges the determination that he was capable of performing other work that existed in significant numbers of jobs in the national economy from March 5, 2012 through January 16, 2015. (*Id.*)

Plaintiff moves for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). (ECF No. 17.) The Commissioner opposes the motion and cross-moves for judgment on the pleadings. (ECF Nos. 20-21.) For the reasons set forth below, the Court denies plaintiff's motion for judgment on the pleadings, denies the Commissioner's cross-motion for judgment on the pleadings, and remands the case to the Administrative Law Judge ("ALJ") for further proceedings consistent with this Memorandum and Order.

## I. FACTUAL BACKGROUND

The following summary of the relevant facts is based upon the Administrative Record developed by the ALJ hearing plaintiff's case following remand.[3] (ECF Nos. 13-15.) A more exhaustive recitation is contained in the parties' submissions to the Court and is not repeated herein.

A. Personal and Work History

Plaintiff was born on January 18, 1960. (AR at 147, 159.) Plaintiff was 52 years old at the onset of his disability on March 5, 2012, and 56 years old at the time of the second hearing before an ALJ in this case on February 2, 2016. (*Id.* at 389, 392.) Plaintiff received a high school education and completed specialized job training in carpentry I and II. (*Id.* at 164.) Plaintiff held only one job before the alleged onset of his disability, working as a roofer for a construction company. (*Id.*) Plaintiff testified that he worked as a roofer for 28 years. (*Id.* at 400.) In this job, plaintiff used machines, tools, and equipment, and carried roofing materials such as slates and shingles, some of which weighed over 100 pounds. (*Id.* at 165.) Plaintiff would stoop, kneel, crouch, climb, and crawl for hours each day while performing his job as a roofer.[4] (*Id.*) Plaintiff was working as a roofer when his alleged disability began as a result of a work-related injury: he testified that he was carrying heavy slate when he "felt the thing pop." (*Id.* at 306, 401.) His testimony and written reports regarding his symptoms from the date of alleged onset through the date of his second hearing before an ALJ are discussed in detail in Section D.

---

category changed on that date to "advanced age" and altered the determination as to whether he could make a successful adjustment to other work. (AR at 618-20.) The "advanced age" category includes ages 55 and over. SSR 83-10. The ALJ incorrectly found that plaintiff's age category changed on January 17, 2015, as plaintiff's birthday is January 18, not January 17, 1960. (*Id.* at 147, 159.)

[3] References to the Administrative Record, including references to the administrative hearing, are to the hearing and materials compiled upon remand, unless otherwise indicated. A different ALJ held the second hearing after the case was remanded for the Commissioner to consolidate the disability insurance benefits and widow's insurance benefits claims.

[4] Plaintiff specified that each day he was required to stand for eight hours, walk for 5.3 hours, climb for one hour, stoop for one hour, kneel for two hours, crouch for four hours, crawl for one hour, handle large objects for 1.6 hours, and reach for three hours. (*Id.* at 165.)

## B. Relevant Medical History

Plaintiff visited David Kim, M.D. ("Dr. Kim") of Premier Care Levittown on March 6, 2012, and reported that he had been experiencing acute back pain, starting one week earlier. (*Id.* at 306.) Plaintiff reported at this visit that the pain "d[id] not limit [his] activities," and he denied numbness or weakness in his extremities. (*Id.*) Dr. Kim noted that plaintiff experienced "muscle spasm of back" and prescribed him Flexeril, Naprozyn, and Vicodin for varying lengths of time over the next week and a half. (*Id.* at 309.) Dr. Kim noted that "services ordered" included "rest 1-2 days." (*Id.*)

Plaintiff's next visit was on March 12, 2012, with Steven Jacobs, D.O. ("Dr. Jacobs"), at Premier Care of Levittown. (*Id.* at 311-15.) Plaintiff reported that the prescribed medicine had not relieved his acute back pain, which he reported started four months earlier and "moderately limit[ed] his] activities." (*Id.* at 311.) Dr. Jacobs noted that "[p]ertinent findings include limited range of neck motion and denies athletic activity." (*Id.*) Musculoskeletal examination showed tenderness of the thoracic spine. (*Id.* at 313.) Dr. Jacobs diagnosed a sprain of the thoracic region and prescribed a Lidoderm adhesive patch and physical therapy. (*Id.* at 313-14.)

Plaintiff also saw chiropractor Brett Pastuch, D.C. ("Dr. Pastuch"), on March 12, 2012, and reported a pain level of nine out of ten. (*Id.* at 206, 267-71.) Dr. Pastuch noted that plaintiff described his pain as "achy, burning, dull, sharp, throbbing." (*Id.* at 206.) He wrote that his objective findings included that head compression and Soto-Hall testing were both positive, and that spinal subluxation levels were C5, C6, T1, T2, T3, T4, and T7. (*Id.*) In a report Dr. Pastuch

prepared for the New York State Workers' Compensation Board (the "Workers' Compensation Board") based on this initial examination, he wrote that plaintiff had approximately 67 percent temporary impairment and could not return to work because of his back pain. (*Id.* at 268, 270-71.) He noted that plaintiff was to return for a follow-up appointment within a week. (*Id.* at 271.)

A magnetic resonance imaging ("MRI") scan of the thoracic spine conducted on March 12, 2012 showed a central disc herniation just touching the spinal cord at the T4-5 level, a left parasagittal disc herniation abutting the spinal cord at the T7-8 level, and an enhancing mass within the epidural space at the level of the T7 vertebral body. (*Id.* at 367.) Plaintiff was also found to have an enhancing mass within the epidural space along the right posterolateral aspect of the canal at the T7 level. (*Id.* at 367-68.) The interpreting radiologist wrote that the differential diagnosis included hemangioma, meningioma, and a process extending from the right facet joint. (*Id.* at 368.)

Dr. Pastuch examined plaintiff again on April 25, 2012. (*Id.* at 275.) His findings were the same as at plaintiff's previous visit, including that plaintiff was "not capable of returning to work as a roofer." (*Id.*) He wrote that "the continue[d] treatment should allow [him] to have objective functional improvement and allow him to return to work in 4-8 weeks." (*Id.*)

On June 11, 2012, Philip M. Rafiy, M.D. ("Dr. Rafiy"), examined plaintiff for his progressively worsening back pain. (*Id.* at 201-02.) Dr. Rafiy found mid-thoracic tenderness, lateral bending to 30 degrees bilaterally, flexion to 30 degrees, extension to 20 degrees,[5] full motor strength of L1-S1,

---

[5] Plaintiff groups these findings, explaining that Dr. Rafiy found that plaintiff had "restricted range of

motion of the lumbar spine" based on his findings of lateral bending to 30 degrees bilaterally, flexion to 30

positive straight leg raise at 90 degrees, and decreased sensation in the left upper arm. (*Id.* at 201.) Dr. Rafiy noted that his impression was thoracic discogenic pain, and that he needed to "rule out thoracic mass." (*Id.*) Dr. Rafiy also noted that plaintiff had a "moderate partial orthopedic disability," and recommended that he continue physical therapy. (*Id.* at 201-02.) Dr. Rafiy wrote that plaintiff "has an incidental finding of a mass that needs to be worked up . . . we need to see if this is the source of his pain." (*Id.* at 201.) Dr. Pastuch also examined plaintiff on June 11, 2012, and found that plaintiff had a reduced cervical range of motion. (*Id.* at 276-79.)

Dr. Rafiy examined plaintiff again on June 25, 2012, and noted similar findings: that plaintiff had mid-thoracic tenderness, lateral bending to 30 degrees bilaterally, flexion to 40 degrees, extension to 20 degrees, positive straight leg raise at 90 degrees, and decreased sensation of the left upper arm. (*Id.* at 262.) Dr. Rafiy diagnosed plaintiff with disc herniation with spasms and incidental epidural mass. (*Id.*) He noted again that plaintiff had moderate partial disability. (*Id.*) Dr. Rafiy completed a Workers' Compensation report based on this examination, dated August 13, 2012, in which he reported that plaintiff had 100 percent temporary impairment. (*Id.* at 258-60.)

On August 13, 2012, Dr. Pastuch examined plaintiff and noted decreased range of motion and thoracic spine problems due to plaintiff's cervical spine issues, and recommended a cervical MRI. (*Id.* at 204.) Dr. Pastuch's assessment from this visit was the following:

Patient has changes from baseline function from exacerbation. He has decreased [range of motion] and problems with [activities of daily living] (sitting, lifting and standing). The patient continues to need a[n] MRI to the cervical spine and his thoracic condition is a result of the cervical spine problem not be[ing] treated and diagnosed correctly.

(*Id.*) Based on plaintiff's August 13, 2012 visit, as well as his visits on August 27, 2012 and August 31, 2012, Dr. Pastuch noted in progress reports prepared for the Workers' Compensation Board that plaintiff had approximately 67 percent temporary impairment and could not return to work because of his back pain. (*Id.* at 284-86, 288-89.)

On September 5, 2012, plaintiff had a thoracic spine MRI taken, which showed T9-10 disc desiccation, loss of disc height, and anterior disc herniation. (*Id.* at 265.) The MRI also showed no cord compression or spinal stenosis. (*Id.*)

On September 17, 2012, Dr. Pastuch examined plaintiff again and found that plaintiff had positive head compression testing, positive maximum left lateral compression testing, positive head distraction, positive Soto-Hall testing, decreased range of motion of the cervical spine (flexion 30/50, right lateral bending 18/45), and spinal subluxation at the C5, C6, T1, T2, T3, T4, and T7 levels. (*Id.* at 287.)

Plaintiff had additional visits with Dr. Pastuch on October 5, 2012 (*id.* at 291), October 22, 2012 (*id.* at 290), November 5, 2012 (*id.* at 291), November 9, 2012 (*id.* at 295), November 23, 2012 (*id.* at 294), December 3, 2012 (*id.* at 295), December 10,

---

degrees, and extension to 20 degrees. (ECF No. 17-1 at 6.)

2012 (*id.* at 298), December 31, 2012 (*id.* at 300), January 4, 2013 (*id.* at 326), February 4, 2013 (*id.*), February 8, 2013 (*id.* at 328), and March 4, 2013 (*id.*). Dr. Pastuch noted thoracic improvement, but also that plaintiff had continued cervical and thoracic pain. (*See, e.g.*, *id.* at 287, 290, 294, 300.)

On March 11, 2013, Dr. Pastuch completed a provider note recording his findings from an examination, including that plaintiff continued to have spinal subluxation at the C5, C6, T1, T2, T3, T4, and T7 levels, his range of motion of the cervical spine remained decreased (flexion 37/50, extension 43/60, bilateral rotation 70/80, left lateral bending 35/45, and right lateral bending 40/45), and he had positive head compression testing, positive right lateral compression testing, and positive head distraction testing. (*Id.* at 331.) Dr. Pastuch also wrote in this provider note that "it [was his] professional opinion" that "[plaintiff's] thoracic pain is from his cervical condition and that both his cervical and thoracic condition is [sic] directly related to his 11/1/11 work injury." (*Id.*) Dr. Pastuch wrote in the "Treatment & Plan" section of the note that plaintiff needed a cervical MRI "which still has not been approved by workers['] compensation." (*Id.*)

Dr. Pastuch wrote in his Workers' Compensation Board progress report for plaintiff's March 8, 2013 and March 15, 2013 visits that plaintiff had 100 percent temporary impairment and could not return to work because of his back and neck pain. (*Id.* at 332-33.)

On March 21, 2013, plaintiff had a cervical MRI taken, which showed a small central disc protrusion at the C4-5 level effacing the ventral aspect of the thecal sac, a parasagittal disc protrusion at the C5-6 level and osteophyte ridging compressing the right aspect of the spinal cord resulting in mass effect upon the exiting C6 nerve root, and circumferential disc bulging at the C6-7 level, contacting the right ventral aspect of the spinal cord. (*Id.* at 322.)

On April 1, 2013, plaintiff visited with Dr. Pastuch and reported thoracic and cervical pain levels of three out of ten. (*Id.* at 334.) Dr. Pastuch noted that plaintiff's thoracic spine had improved, but that the MRI indicated that plaintiff had a positive disc injury to his cervical spine. Dr. Pastuch again found that plaintiff had positive head compression testing, positive right lateral compression testing, positive head distraction testing, positive Soto-Hall testing for the thoracic spine, decreased range of motion of the spine, and positive spinal subluxation at the C5, C6, T1, T2, T3, T4 and T7 levels. (*Id.*) Dr. Pastuch reported the same findings at a June 28, 2013 visit. (*Id.* at 345.) Plaintiff again reported thoracic and cervical pain levels of three out of ten. (*Id.*) Dr. Pastuch examined plaintiff and reported that he: had "made functional gains from the treatment of his disc injury"; had reduced, but improving, ranges of motion; had problems with activities of daily living, including lifting and sleeping; and had decreased pain. (*Id.*)

Plaintiff had additional visits with Dr. Pastuch on August 16, 2013 (*id.* at 370), August 19, 2013 (*id.*), August 26, 2013 (*id.* at 371), September 6, 2013 (*id.*), September 20, 2013 (*id.* at 372), October 4, 2013 (*id.* at 373), October 11, 2013 (*id.*), and October 18, 2013 (*id.* at 374). Plaintiff reported increasing levels of thoracic pain—three or four out of ten—and cervical pain—three, four, or seven out of ten. (*Id.* at 370-74.) As in the past, he described his pain as "achy, burning, dull, sharp, throbbing." (*Id.*) Dr. Pastuch noted that cervical range of motion was decreased, head compression and right lateral compression remained positive, and spinal subluxation remained at the C5, C6, T1, T2, T3, T4 and T7 levels. (*Id.* at 370-73.) On September 6, 2013, Dr. Pastuch reported that plaintiff had made "functional gains" from

the treatment of his cervical disc injury, and that he had reached medical improvement and baseline for his condition. (*Id.* at 372.) In his notes from the September 20, 2013, and October 11, 2013 appointments, Dr. Pastuch reported that plaintiff had "an exacerbation" with loss from baseline functioning, including in his ranges of motion and daily living activities. (*Id.* at 372-73.)

On November 1, 2013, Dr. Rafiy [6] examined plaintiff and found mid-thoracic tenderness, pain with forward flexion and lateral bending, increased kyphosis, full L1-S1 motor strength, no problems with heel and toe walk, cervical tenderness, positive cervical compression test, severe upper trapezii muscle spasms, right shoulder tenderness, positive impingement, positive apprehension, and difficulties placing his right hand behind his head and back. (*Id.* at 521-22.) Plaintiff reported that significant pain continued, that he had trouble placing his right hand behind his head and back, and that he had trouble sleeping. (*Id.* at 521.) Dr. Rafiy found that plaintiff had right shoulder derangement and thoracic discogenic pain and cervical discogenic pain, and noted that he ruled out rotator cuff tear. (*Id.* at 521.) Dr. Rafiy prescribed plaintiff Duexis and Vicodin, and recommended an MRI of the right shoulder. (*Id.* at 521-22.)

Plaintiff had an MRI taken on November 7, 2013, which showed that he had subacrimonial bursal effusion, acromioclavicular thickening with arthrosis resulting in abutment of the supraspinatus

muscle and tendon, increased signal of the supraspinatus tendon consistent with partial undersurface rotator cuff tendon tear, and moderate biceps tenosynovial effusion. (*Id.* at 546.)

On November 13, 2013, Dr. Rafiy recorded that plaintiff had right shoulder tenderness, positive impingement, positive apprehension, and 0-100 degrees of flexion. (*Id.* at 525.) On November 18, 2013, Dr. Rafiy performed another examination and made a similar assessment, noting right shoulder derangement, tenosynovitis, partial tendon tear, cervical discogenic pain with radiculopathy, and thoracic discogenic pain.[7] (*Id.* at 523-24.) Dr. Rafiy recommended injections if pain worsened. (*Id.* at 524.)

Plaintiff continued seeing Dr. Pastuch throughout November and December 2013. Dr. Pastuch noted continued thoracic and cervical pain (*id.* at 375-79), and decreased range of motion and positive orthopedic testing (*id.* at 376).

On January 28, 2014, Dr. Rafiy examined plaintiff and noted that plaintiff had a "work-related accident." (*Id.* at 526.) He explained further that:

> The patient was a roofer for many years and the constant repetitive motion and lifting with his upper extremities cause[d] severe chronic right shoulder pain. He continues to have severe pain. The patient was diagnosed with a right shoulder rotator cuff tear and is considering a

---

[6] The Administrative Record shows that a Dr. Michael Rafiy joined Dr. Philip Rafiy's practice around this time. (*Id.* at 522.) It is not entirely clear which Dr. Rafiy treated plaintiff at some of his subsequent appointments, but the Commissioner assumes that it was Dr. Philip Rafiy—who had treated plaintiff up until this point—and the Court does the same.

[7] Dr. Rafiy based his impressions on the following physical examination findings: severe paracervical

and trapezii muscle spasms bilaterally with multiple trigger points, right shoulder tenderness over the acromioclavicular joint, positive impingement and apprehension testing of the right shoulder, decreased range of motion of the right shoulder, decreased right handgrip, mid-thoracic tenderness, pain with forward flexion and lateral bending, and decreased sensation to the right paracervical area in the C5, C6, and C7 distribution on the right. (*Id.* at 523.)

surgical procedure due to severe pain despite a long course of conservative management. [Plaintiff] has not been able to work for up to one year or more due to the severity of the pain. He continues to have difficulties using the right upper extremity.

(*Id.*) In addition to the right shoulder rotator cuff tear, Dr. Rafiy again noted that plaintiff's MRI revealed subacrimonial bursal effusion. (*Id.*) Plaintiff reported having to take anti-inflammatories and Vicodin to relieve the pain. (*Id.*) He noted pain with lifting even light objects ranging from five to ten pounds. (*Id.*) Dr. Rafiy wrote as his "plan" that plaintiff was "a candidate for right shoulder arthroscopic surgery due to ongoing pain despite a long course of conservative management." (*Id.* at 527.) Additionally, Dr. Rafiy wrote that "patient has a moderate partial orthopedic disability and is unable to work at this time." (*Id.*)

Dr. Rafiy examined plaintiff on February 24, 2014, and noted that plaintiff had ongoing pain, numbness, and tingling in both hands. (*Id.* at 528.) Dr. Rafiy also noted bilateral positive Tinel's sign, positive Phalen's testing, slight decreased sensation in the fingertips of both hands, and reduced bilateral handgrip. (*Id.*) He determined that plaintiff had possible carpal tunnel syndrome and recommended upper extremity electromyography and nerve conduction velocity ("EMG/NCV") studies. (*Id.*)

Dr. Rafiy examined plaintiff again on February 26, 2014, and noted again plaintiff's right shoulder rotator cuff tear and impingement. (*Id.* at 529.) Plaintiff had continued weakness and numbness in his hands, cervical tenderness, positive cervical compression testing, decreased bilateral handgrip, and decreased sensation in the first, second, and third digits. (*Id.* at 530.) At this visit, under "plan," Dr. Rafiy wrote: "I

request authorization for right shoulder arthroscopic surgery with acromioplasty and rotator cuff tendon repair. The patient has a marked, partial orthopedic disability and is unable to return to work." (*Id.* at 529.) Dr. Rafiy also conducted an upper electrodiagnostic study and noted that the results were normal, and that there was no evidence of carpal tunnel syndrome or cubital tunnel syndrome. (*Id.* at 530.) Dr. Rafiy diagnosed plaintiff with cervical discogenic pain and bilateral wrist contusions, and prescribed wrist splints. (*Id.*)

Plaintiff visited Dr. Rafiy on March 24, 2014, and reported that he was experiencing neck and left shoulder pain. (*Id.* at 531.) Dr. Rafiy ordered an MRI of the left shoulder to "rule out rotator cuff tear." (*Id.*) The MRI was taken that day and showed acromioclavicular arthropathy with thickening, type 2 acromion resulting in impingement of the supraspinatus tendon, and biceps tenosynovitis with irregular superior labrum. (*Id.* at 545.) Dr. Rafiy also examined plaintiff's right shoulder again and noted similar findings as at past visits. (*Id.* at 532.)

Plaintiff visited Dr. Pastuch monthly from March through May 2014, continuing to complain of cervical and thoracic spine pain. (*Id.* at 512-13.) Spinal subluxation continued at the C5, C6, T1, T2, T3, T4, and T7 levels. (*Id.*)

On May 29, 2014, plaintiff visited Dr. Rafiy and reported severe lower back pain and right shoulder pain. (*Id.* at 533.) Dr. Rafiy found decreased range of motion of the right shoulder, positive apprehension, positive Hawkins test, motor strength of the right arm of 4/5, lumbar tenderness, and positive straight leg raise at 90 degrees. (*Id.*) Dr. Rafiy wrote that plaintiff had lumbar discogenic pain, as well as right shoulder rotator cuff tear, and that plaintiff should

"[c]onsider right shoulder surgery due to worsening symptoms." (*Id.*)

Plaintiff expressed the same complaints at a visit with Dr. Rafiy on June 10, 2014. (*Id.* at 534.) Dr. Rafiy's physical examination findings included thoracic tenderness with spasms and lateral bending to only 40 degrees bilaterally. (*Id.*) Dr. Rafiy noted thoracic disc herniation, lumbar discogenic pain, and right shoulder rotator cuff tear, and that plaintiff would be scheduling his right shoulder surgery "when he has time." (*Id.*)

Plaintiff raised the same right shoulder problems at appointments with Dr. Rafiy on July 3, 2014 and July 30, 2014. (*Id.* at 535, 537.) On July 3, 2014, Dr. Rafiy noted that plaintiff had a "marked, partial orthopedic disability." (*Id.* at 535.) On July 30, 2014, Dr. Rafiy wrote that, in addition to the right shoulder tear, plaintiff had cervical radiculopathy. (*Id.* at 537.) Dr. Rafiy further noted that plaintiff was considering right shoulder surgery and "waiting to receive authorization." (*Id.*) He did not note any thoracic or lumbar spine issues at either of these appointments. (*See id.* at 536-37.)

Plaintiff had a right shoulder MRI taken on September 8, 2014. (*Id.* at 547.) Dr. Rafiy wrote that this MRI showed subacromial bursal effusion, acromioclavicular joint hypertrophy, acromial impingement on the supraspinatus tendon, increased signal supraspinatus tendon consistent with supraspinatus tendinitis versus partial undersurface supraspinatus tendon tear, and large biceps tendon tenosynovial effusion. (*Id.* at 538, 547.) Dr. Rafiy wrote that plaintiff was still waiting for authorization for his surgery. (*Id.*) He also noted that plaintiff was seeing an endocrinologist to lower his hemoglobin level to get preoperative clearance for the surgery. (*Id.*)

On November 18, 2014, plaintiff saw orthopedic surgeon Jeffrey M. Meyer, M.D. ("Dr. Meyer"), for treatment for his right shoulder pain. (*Id.* at 550.) Dr. Meyer performed a physical examination and found that plaintiff had an active range of motion, forward elevation to 140 degrees bilaterally, abduction to 150 degrees bilaterally, 70 degrees symmetrical external rotation, internal rotation six inches below the scapular tip, passive right shoulder abduction to 170 degrees, passive forward elevation to 180 degrees, and thumb down abduction showing minimal discomfort and no gross weakness. (*Id.* at 551.) Dr. Meyer found from a neurological examination that plaintiff had a mild right thenar atrophy compared to left, that there was a 5/5 opposition and key pinch bilaterally, and tip dysesthesia ulnar innervated digits bilaterally only. (*Id.*) Dr. Meyer noted that his impression was that the MRI showing suprasinatus tendinosis was "probabl[y] a poor study. Disc to be reviewed with radiologist." (*Id.*) He also noted that plaintiff's physical examination showed improved thumb down abduction strength, and that X-rays were positive for large subacromial spur leading to anterior impingement. (*Id.*)

On December 16, 2014, Dr. Meyer recorded that plaintiff had chronic right shoulder rotator cuff symptomology, including the inability to actively elevate overhead, range of motion limited to 90 degrees of forward elevation of the right shoulder, 100 degrees of abduction, 45 degrees of external rotation, and internal rotation nine inches below tip of scapular, passive right shoulder abduction to 160 degrees, thumbs down test positive for pain and weakness, moderate pain with Hawkins test at 80 degrees, and decreased sensation at the C8 dermatome and ulnar nerve distribution bilaterally. (*Id.* at 552-53.) Dr. Meyer wrote that plaintiff was to be scheduled for right shoulder arthroscopy with

acromioplasty and opus rotator cuff repair "at his earliest election. . . . [a]uthorization requested for formal operative rotator cuff repair." (*Id.* at 553.) Based on this visit, on December 20, 2014, Dr. Meyer noted in a Workers' Compensation Board progress report that plaintiff had 100 percent temporary impairment and could not return to work because he was "unable to do job/requires surgery." (*Id.* at 588.)

During the course of his visits with Drs. Rafiy and Meyer, plaintiff visited chiropractor Dr. Pastuch monthly from January 10, 2014 through September 5, 2014. (*Id.* at 511-15.) Dr. Pastuch's notes include that plaintiff was "[h]urt at work as roof[er] lifting on 11/1/11." (*Id.* at 511.) Each of Dr. Pastuch's notes from this period indicate that plaintiff sought treatment to "relieve pain, decrease inflammation, decrease muscle spasms, improve ADL,[8] improve function." (*Id.* at 511-15.)

On March 4, 2015, Dr. Meyer performed plaintiff's arthroscopic right shoulder surgery.[9] (*Id.* at 548.) Plaintiff saw Dr. Meyer for a post-operative examination on March 10, 2015. (*Id.* at 556.) Dr. Meyer recorded in his progress note from this visit that he found an unexpected high grade tearing of the biceps stump that necessitated biceps tenotomy. (*Id.*) He also included that distal migration of the biceps was noted clinically, and that passive right shoulder elevation and abduction were limited to 90 degrees. (*Id.* at 557.) Dr. Meyer wrote that plaintiff should use an abduction sling for the next week, and recommended physical therapy for a six-week period. (*Id.*)

Dr. Meyer examined plaintiff at additional visits through July 2015. (*Id.* at 558-63.) He noted that plaintiff reported episodic crepitation of the shoulder, but no ongoing pain, but that plaintiff "has not returned to work due to concurrent neck/back issues, unrelated." (*Id.* at 563.) Physical examination revealed flattening about the deltoid muscle, and decreased range of motion in the shoulder as follows: forward elevation right/left 160/170 degrees, abduction 150/160 degrees, external rotation 45/50 degrees, and internal rotation six inches below tip of scapular. (*Id.* at 564.) Dr. Meyer noted that, when plaintiff made a fist, there was a balling of the distal biceps, but no pain along the course of the biceps, and no evident weakness. (*Id.*)

Dr. Meyer examined plaintiff on October 6, 2015, and noted that plaintiff "reports satisfaction with function of right shoulder; occasional residual discomfort noted only." (*Id.* at 565.) Dr. Meyer found a "Popeye-type muscle" on plaintiff's right biceps, decreased right shoulder range of motion, and mild weakness on the right shoulder compared to the left. (*Id.*) He noted dysesthesia in the ulnar nerve/CA distribution of the bilateral upper extremities. (*Id.*) Dr. Meyer examined plaintiff again on November 3, 2015, and noted similar complaints and findings from his physical examination. (*Id.* at 567.) He advised plaintiff not to overextend his arms to avoid crepitation. (*Id.* at 568.)

At "maintenance visit[s]" with Dr. Pastuch approximately once a month from October 3, 2014 through January 8, 2016 (with some periods of more and less frequent visits), plaintiff reported frequent cervical pain, with the pain level typically ranging from five to seven out of ten, and reaching nine out of ten at a January 8, 2016 visit. (*Id.* at 603-07.) Notes from this period indicate "sublaxations found on assessment and

---

[8] "ADL" is an acronym for "activities of daily living."

[9] More specifically, Dr. Meyer performed right shoulder arthroscopy, with biceps tenotomy, labral debridement, and arthroscopic rotator cuff repair. (AR at 548.)

adjusted." (*Id.* at 606-07.) Dr. Pastuch's notes from this period do not include any discussion of thoracic spine pain.

## C. Consultative Examiner and Independent Medical Examiner Opinions

On October 15, 2012, Charlene Andrews-Watson, M.D. ("Dr. Andrews-Watson") conducted a consultative internal medicine examination of plaintiff. (*Id.* at 207-10.) Dr. Andrews-Watson wrote that the Division of Disability Determination had referred plaintiff for the examination. (*Id.* at 207.) Dr. Andrews-Watson noted that plaintiff reported a back pain level of eight out of ten without pain medication, and four out of ten with pain medication. (*Id.*) Plaintiff told Dr. Andrews-Watson that he had "back pain affecting his entire back starting since 11/11/11[10] after an injury at work" and that the back pain had "progressively worsened recently." (*Id.*) Plaintiff also reported that he had thoracic herniated discs, numbness in his arms, and bilateral knee pain. (*Id.*) With regard to activities of daily living, plaintiff told Dr. Andrews-Watson that he cooked four times per week, did not clean or do laundry, shopped twice per week, could take care of his personal grooming needs, and watched television, listened to the radio, and read. (*Id.* at 208.)

Dr. Andrews-Watson examined plaintiff and found that plaintiff had normal gait, could walk on his heels and toes without difficulty, could squat fully, could stand normally, used no assistive devices, could change for his examination, could get on and off the examination table, and could rise from a chair. (*Id.*) Dr. Andrews-Watson also found that plaintiff's cervical spine had full range of motion bilaterally, and his lumbar spine had full range of motion except in

flexion and extension. (*Id.* at 209.) Plaintiff showed no sensory deficit. (*Id.*) Dr. Andrews-Watson found that plaintiff had no restrictions for sitting, and mild restrictions for prolonged standing, pushing, pulling, climbing, walking, lifting, and carrying heavy objects. (*Id.* at 210.)

On July 30, 2013, Howard Levin, M.D. ("Dr. Howard Levin") performed an independent orthopedic examination in connection with plaintiff's Workers' Compensation claim. (*Id.* at 317-21.) Dr. Levin wrote that plaintiff reported that he was involved in a work-related accident on November 1, 2011. (*Id.* at 317.) Plaintiff reported consistent neck and mid-back pain—he said that he had a pain level that day of a six out of ten—from which he received only short-term relief from physical therapy and chiropractic treatment. (*Id.* at 318.) Plaintiff also reported headaches. (*Id.*) Plaintiff reported that he could walk one to two city blocks without pain, he had difficulty climbing stairs, he could sit for approximately 30 minutes at a time, he experienced weakness, numbness, and tingling, and his pain increased with reaching overhead, bending, walking, and sleeping. (*Id.*)

Dr. Levin found, based on a physical examination, that plaintiff's gait and station were normal, and noted that plaintiff used no assistive device. (*Id.* at 319.) He examined plaintiff's cervical spine and found that plaintiff had normal muscle strength, that his sensory responses were intact throughout the upper extremities, and that his deep tendon reflexes were equal bilaterally, but that he had reduced ranges of motion (flexion 20/45, extension 20/45, and bilateral rotation 40/70). (*Id.*) Lumbar spine testing similarly revealed normal muscle strength, sensory responses

---

[10] It appears from other documents in the Administrative Record that the alleged date of the accident was November 1, 2011, rather than November 11, 2011.

intact throughout the lower extremities, reflexes that were equal bilaterally, and that straight leg raise testing was negative. (*Id.* at 319-20.) The lumbar spine testing also revealed reduced ranges of motion (flexion 40/90, extension 10/30). (*Id.* at 320.) Dr. Levin diagnosed plaintiff with cervical spine, thoracic spine, and lumbar spine strains. (*Id.*) He determined that plaintiff's work restrictions consisted of "no lifting objects weighing greater than 10 lbs. and no climbing." (*Id.*) Dr. Levin's assessment was that plaintiff's condition qualified for spinal permanency of the cervical, lumbar, and thoracic spine pursuant to the New York State Workers' Compensation Board Guidelines Table 11.1, Class 2, Severity A. (*Id.* at 320-21.)

D. Relevant Testimonial Evidence

    1. First Administrative Hearing and 2012 Function Report

The first administrative hearing was held on September 24, 2013, in Buffalo, New York, before ALJ Bruce McDougall. (*Id.* at 27.) Plaintiff testified that he was 52 years old (*id.* at 29), and that he had graduated from high school and could read and write (*id.* at 39). Plaintiff testified that he worked as a roofer from 1998 until March 5, 2012. (*Id.* at 31-33.) He explained that he stopped working after hurting his back, neck, and shoulders. (*Id.* at 33-36.)

Plaintiff testified that his treatment for his back and neck pain had been primarily chiropractic and some pain medication, which he took at most twice per week. (*Id.* at 35-36, 38, 44.) He testified that the chiropractic treatment provided temporary relief for his back, and that the pain returned between treatments. (*Id.* at 35-36.) He also testified that he did not have a full range of motion in his neck (*id.* at 38), and that his neck problems caused occasional numbness in his hands (*id.* at 37).

Plaintiff testified that sitting for "a while" caused pain. (*Id.* at 38.) He testified that he could sit for approximately ten to fifteen minutes before having to stand up (*id.* at 43), and that he could stand in one place for approximately five to ten minutes and walk for fifteen to twenty minutes (*id.* at 43-44).

Plaintiff testified that he did not go to the gym, but took walks, including walking at the mall. (*Id.* at 40.) He testified that he shopped at the supermarket and would buy "a few things" but "[n]othing big," because he did not want to lift a lot. (*Id.* at 40-41.) He said that he would "use the wagon and lean on the wagon . . . [e]ven if [he was] just getting a few things." (*Id.* at 41.) Plaintiff also testified that he would help around the house by folding laundry and helping with cooking, such as by peeling apples. (*Id.* at 41.)

Plaintiff described other activities of daily living in a September 17, 2012 function report. (*Id.* at 151-58.) For instance, he reported that he took care of his granddaughter by feeding and clothing her, making sure she went to school, and taking her to the doctor. (*Id.* at 152.) He reported that he had some pain while dressing, bathing, and caring for his hair. (*Id.*) He did some light cooking on a daily basis. (*Id.* at 153.) His daughter did most of the housework because of his neck and back pain. (*Id.* at 154.) He went outside every day, and would travel by walking, driving, or riding in a car. (*Id.*) He shopped for food or gas twice per week. (*Id.* at 155.) He spoke on the phone and visited with family and friends every day, and regularly went to church, the store, and the doctor. (*Id.* at 156.) He could not lift heavy items, could not stand for "long time period[s]," could not walk long distances, and could not sit for a "long time" without pain. (*Id.*) He estimated that he could walk 50 yards before needing to stop and rest for around three to four minutes. (*Id.* at 158).

2. Second Administrative Hearing

The second administrative hearing was held on February 2, 2016, in Long Island, New York, before ALJ Alan B. Berkowitz. (*Id.* at 389, 480.) As stated *supra*, plaintiff testified that he was carrying heavy slate while working as a roofer when he "felt the thing pop." (*Id.* at 401.) Plaintiff testified that after feeling a pop, he went to get his car but could not release the brake and could not reach down. (*Id.*) He told the ALJ that that was his last day of work, and that after his injury he had MRIs taken "and it was two herniations I think right near each other." (*Id.*)

Plaintiff testified that, as of the date of the hearing, he still had pain in his lower and upper back, shoulder, neck, right hip, and knee. (*Id.* at 404.) Plaintiff testified that he was claiming disability because of his back, neck, knees, hands, joints, numbness in his arms, and some arthritis. (*Id.* at 396-97.) He also testified that he had high blood pressure, high cholesterol, and diabetes. (*Id.* at 402-03.) Plaintiff testified that his physicians had taken him off pain medication and "he only t[ook] over the counter Alieve [sic], Tylenol and Advil." *Id.* at 404-05.) He testified that, at the time of the hearing, his only treatment was going to the chiropractor once a month. (*Id.* at 404.)

Plaintiff testified, as he had at the first hearing, that sitting for "a long time" caused pain. (*Id.*) He testified that he could sit for approximately 30 minutes before having to stand up (*id.*), that he could stand for approximately 30 minutes (*id.*), and that he could lift five pounds, but "if [he] overd[id] it, [he] notice[d] it" (*id.* at 408-09). Plaintiff testified that he could not exercise due to high blood sugar, but said he tried to walk sometimes for exercise. (*Id.* at 402-03.) Plaintiff testified that he had difficulty walking over 100-200 feet and navigating stairs. (*Id.* at 398, 411.)

Plaintiff also testified regarding issues with his shoulder. He said that, prior to his shoulder surgery on March 15, 2015, he could not pick anything up with his right arm. (*Id.* at 406.) He testified that, following the surgery, he had some function, but he experienced weakness and throbbing in his right arm, with a clicking sensation whenever using it. (*Id.* at 407.) He also testified regarding pain and numbness in his fingers since his shoulder surgery. (*Id.* at 407, 409.)

Plaintiff testified that his daughters helped with housework and shopping because he was unable to do these activities alone. (*Id.* at 409-11.) Plaintiff also testified that he had trouble sleeping because of pain. (*Id.* at 411.)

Impartial vocational expert Dale Pasculli also testified at the second administrative hearing. (*Id.* at 412-15, 612.) The vocational expert testified that plaintiff had worked as a roofer, and that there were no transferable skills for a roofer. (*Id.* at 413.) The ALJ asked the vocational expert to consider a hypothetical individual of the same age, education, and background, and to assess whether that person could perform plaintiff's past work. (*Id.*) The vocational expert testified that such a person could not. (*Id.*) The vocational expert testified that such a person could, however, perform the following jobs: usher, DOT 344.677-014, SVP2, light exertional level (of which there exist approximately 22,700 jobs in the nation), counter clerk, DOT 249.366-010, SVP2, light exertional level (approximately 18,200 jobs in the nation), and sandwich board carrier, DOT 299.687-014, SVP1, light exertional level (approximately 9,200 jobs in the nation). (*Id.* at 413-14.) The ALJ clarified at the hearing that this last job, sandwich board carrier, was "somebody who wears a sign . . . outside." (*Id.* at 414.) The vocational expert confirmed, and the ALJ asked him to provide a different

representative job that plaintiff could perform. (*Id.*) The vocational expert said that he could not, given plaintiff's residual functional capacity. (*Id.*)

## II. PROCEDURAL BACKGROUND

On September 5, 2012, plaintiff filed widow's insurance and disability insurance benefits claims under Title II of the Social Security Act, alleging disability as of March 5, 2012. (*Id.* at 1, 147-48, 389, 392.) Plaintiff's claim for benefits was denied on October 19, 2012 (*id.* at 94), and plaintiff filed a written request for a hearing, dated December 13, 2012 (*id.* at 100). Plaintiff appeared with counsel and testified at a hearing before ALJ Bruce McDougall on September 24, 2013, in Buffalo, New York. (*Id.* at 27.) On October 23, 2013, ALJ McDougall denied plaintiff's disability insurance benefits claim. (*Id.* at 68.) On December 23, 2014, the Appeals Council denied plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (*Id.* at 2.)

Plaintiff then commenced this lawsuit on February 18, 2015, seeking review of the Commissioner's decision. (ECF No. 1.) On June 25, 2015, the parties submitted a stipulation and order of remand, in light of the fact that defendant was "unable to locate a complete copy of the decision denying plaintiff's claim for widow's insurance benefits; and therefore, cannot prepare a certified administrative record for filing with the Court as required by the third sentence of 42 U.S.C. § 405(g)." (ECF No. 7 at 1.) The parties stipulated to remanding plaintiffs' claims to the Commissioner to consolidate the disability insurance benefits and widow's insurance benefits claims, conduct a new hearing, and issue a new decision on the consolidated claims. (*Id.* at 1-2.) The Court signed the order of remand on June 26, 2015. (ECF No. 9.)

On February 2, 2016, a new ALJ, Alan B. Berkowitz, held a hearing on plaintiff's case in Long Island, New York. (AR at 389, 480.) Plaintiff appeared with counsel and testified again. (*Id.* at 389.) Vocational expert Dale Pasculli also testified at this hearing. (*Id.*) On February 24, 2016, ALJ Berkowitz issued a partially favorable decision, finding that plaintiff was not disabled prior to January 17, 2015,[11] but that plaintiff was disabled from January 17, 2015 through the date of the ALJ's decision. (*Id.* at 608, 620.)

On March 28, 2016, plaintiff submitted a letter to the Appeals Council, appealing "only the unfavorable portion of the [ALJ's] determination, from March 5, 2012 to January 16, 2015," based on plaintiff's claim that the onset date of disability was March 5, 2012. (*Id.* at 480.) Plaintiff requested in his letter that the Appeals Council provide a recording of the audio transcript of the hearing and a 25-day extension to submit his written appeal. (*Id.* at 480-82.)

Plaintiff claims that he received neither the audio transcript nor acknowledgment of his request for an extension, and repeatedly requested access to the online electronic file to support his written arguments for appeal. (ECF No. 17-1 at 4; AR at 384-85.) On November 30, 2016, plaintiff's attorney sent the Appeals Council a letter explaining that "[his] office represents [plaintiff]," and "[a]s per our conversation, on multiple occasions, my office has . . . confirm[ed] my representation of [plaintiff] . . . but I am still not the representative on file." (AR at 384.) Plaintiff's attorney enclosed his "Appointment of Representative" form,

---

[11] The ALJ incorrectly found that plaintiff's age category, and thus his disability determination,

changed on January 17, 2015, rather than January 18, 2015. *See supra* note 2.

dated June 14, 2016, in his November 30, 2016 letter to the Appeals Council. (*Id.* at 385.) On June 7, 2016, the Appeals Council had sent an encrypted CD of exhibits and recordings to another individual at plaintiff's attorney's office. (*Id.* at 386-88.) The Appeals Council wrote in its June 7, 2016 letter enclosing the CD that "[plaintiff's] correspondence suggest[ed] that [he] might have additional arguments and/or materials that [he] might wish to present," and that plaintiff had an additional 30 days to submit further materials. (*Id.* at 386.)

On December 14, 2016, the Appeals Council issued its decision, stating that it "found no reason . . . to assume jurisdiction," and that:

> You submitted written exceptions . . . generally disagreeing with the [ALJ's] findings and conclusions. You did not provide any specific reasons to support your written exceptions.
>
> Accordingly, we do not find that your written exceptions provide a basis for changing the [ALJ's] decision dated February 24, 2016. In addition, we find that the [ALJ's] decision complies with the orders of the U.S. District Court and Appeals Council. Furthermore, the decision is consistent with our applicable laws, regulations, and Social Security Rulings.

(*Id.* at 381.) The Appeals Council notified plaintiff in this letter that the ALJ's decision stood as the Commissioner's final decision. (*Id.*)

On May 8, 2017, this Court signed another order granting the parties' motion to reopen the case. (ECF No. 12.) On July 7, 2017, plaintiff moved for judgment on the pleadings. (ECF No. 17.) The Commissioner submitted a cross-motion for judgment on the pleadings on October 6, 2017 (ECF Nos. 20-21), and submitted a corrected memorandum of law in support of this motion on October 10, 2017 (ECF No. 22). On November 10, 2017, plaintiff responded to the Commissioner's cross-motion for judgment on the pleadings. (ECF No. 25.) The Court has fully considered the parties' submissions.

III. STANDARD OF REVIEW

A district court may set aside a determination by the Commissioner "only if it is based upon legal error or if the factual findings are not supported by substantial evidence in the record as a whole." *Greek v. Colvin*, 802 F.3d 370, 374-75 (2d Cir. 2015) (citing *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008); 42 U.S.C. § 405(g)). The Supreme Court has defined "substantial evidence" in Social Security cases to mean "more than a mere scintilla" and that which "a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citation omitted); *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013). Furthermore, "it is up to the agency, and not [the] court, to weigh the conflicting evidence in the record." *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998). If the court finds that there is substantial evidence to support the Commissioner's determination, the decision must be upheld, "even if [the court] might justifiably have reached a different result upon a *de novo* review." *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991) (citation omitted); *see also Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998) ("Where an administrative decision rests on adequate findings sustained by evidence having rational probative force, the court should not substitute its judgment for that of the Commissioner.").

IV. DISCUSSION

A. The Disability Determination

A claimant is entitled to disability benefits if the claimant is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). An individual's physical or mental impairment is not disabling under the Social Security Act unless it is "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* § 1382c(a)(3)(B).

The Commissioner has promulgated regulations establishing a five-step procedure for evaluating disability claims.[12] *See* 20 C.F.R. §§ 404.1520, 416.920. The Second Circuit has summarized this procedure as follows:

The first step of this process requires the [Commissioner] to determine whether the claimant is presently employed. If the claimant is not employed, the [Commissioner] then determines whether the claimant has a "severe impairment" that limits her capacity to work. If the claimant has such an impairment, the [Commissioner] next considers whether the claimant has an impairment listed in Appendix 1 of the regulations. When the claimant

has such an impairment, the [Commissioner] will find the claimant disabled. However, if the claimant does not have a listed impairment, the [Commissioner] must determine, under the fourth step, whether the claimant possesses the residual function capacity to perform her past relevant work. Finally, if the claimant is unable to perform her past relevant work, the [Commissioner] determines whether the claimant is capable of performing any other work.

*Brown v. Apfel*, 174 F.3d 59, 62 (2d Cir. 1999) (quoting *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996)). The claimant bears the burden of proof with respect to the first four steps; the Commissioner bears the burden of proving the last step. *Id.*

The Commissioner must consider the following in determining a claimant's entitlement to benefits: "(1) the objective medical facts; (2) diagnosis or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; (4) the claimant's educational background, age, and work experience." *Id.* (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam)).

B. The ALJ's Ruling[13]

In the instant case, ALJ Berkowitz (hereinafter, "the ALJ") first noted that plaintiff met the insured status requirements of the Social Security Act through December 31, 2017. (AR at 614.) Next, at the first step in the five-step sequential process described

---

[12] The ALJ performs this five-step procedure in the first instance; the Appeals Council then reviews the ALJ's decision and determines if it stands as the Commissioner's final decision. *See, e.g.*, *Greek*, 802 F.3d at 374.

[13] The ALJ's ruling discussed in this opinion is the ruling ALJ Berkowitz issued after hearing the case on remand.

*supra*, the ALJ determined that plaintiff had not engaged in substantial gainful activity since March 5, 2012, the date of the alleged onset of his disability. (*Id.*) At step two in the five-step process, the ALJ determined that plaintiff had the following severe impairments: degenerative disc disease, herniated discs, and arthritis, and noted that plaintiff's status was post-shoulder surgery for torn rotator cuff. (*Id.*) The ALJ also noted that the record showed a history of diabetes and hypertension, but that, first, these conditions were well-controlled when plaintiff was compliant with his medications, and therefore they only minimally affected his ability to function; and, second, plaintiff did not allege functional limitations from these conditions at the hearing. (*Id.* at 615.)

At step three, the ALJ concluded that plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 404.1520(d), 404.1525, and 404.1526). (*Id.*) The ALJ explained that he considered the listed impairment under Section 1.00 (musculoskeletal), but that "the requisite criteria for the relevant listings were absent from the medical records," and that "no treating or examining physician ha[d] indicated findings that would satisfy the requirements of any listed impairment." (*Id.*)

At the fourth step, the ALJ found that plaintiff did not have the residual functional capacity to perform his past relevant work. (*Id.* at 618.) The ALJ wrote that, after careful consideration of the entire record, he found that since March 5, 2012:

> [Plaintiff] has the residual functional capacity to perform light work[14] as defined in 20 C.F.R. 404.1567(b) except [he] can sit and stand/walk six hours a day in an eight-hour day and lift/carry ten pounds frequently and twenty pounds occasionally. [Plaintiff] can occasionally[] bend[] and reach with the dominant right arm and can occasionally be exposed to heights and dangerous machinery.

(*Id.* at 615.)

The ALJ stated that, in considering plaintiff's symptoms, he followed a two-step process, in which an ALJ must first determine whether there is an underlying medically determinable physical or mental impairment. (*Id.*) Second, the ALJ explained, after finding that an underlying physical or mental impairment that could be reasonably expected to produce plaintiff's pain or other symptoms has been shown, the ALJ is required to evaluate the intensity, persistence, and limiting effects of plaintiff's symptoms to determine the extent to which they limit plaintiff's functioning. (*Id.*) Whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the ALJ must make a finding on the credibility of the statements based on the ALJ's consideration of the entire case record. (*Id.* at 615-16.)

The ALJ began this portion of his ruling by summarizing plaintiff's testimony at the

---

[14] Light work is defined as work that "involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds," as well as work that "requires a good deal of walking or standing . . . or . . . sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 404.1567(b). Further, an individual who can perform light work "can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." *Id.*

hearing: "plaintiff alleged disability due to chronic back pain." (*Id.* at 616.) The ALJ briefly highlighted portions of plaintiff's testimony, including that plaintiff "suffers from herniated discs; which causes [] middle to lower back pain," and "he only takes over the counter Alieve [sic], Tylenol and Advil." (*Id.*)

At the first step, the ALJ stated that, after he carefully considered all of the evidence, he found that plaintiff's medically determinable impairments "could reasonably be expected to produce the alleged symptoms." (*Id.*) At the second step, however, he found that plaintiff's statements about the intensity, persistence, or functionally limiting effects were "not entirely credible." (*Id.*) He concluded that, based on the entire record, "the evidence fails to support [plaintiff's] assertions of total disability until January 17, 2015." (*Id.* at 618.) More specifically, the ALJ found that plaintiff "suffer[ed] some limitation" due to his impairments that affected his capacity to perform work, but that he retained the residual functional

capacity to perform, with certain limitations, the exertional demands of light work. (*Id.*)

In support of this conclusion, the ALJ considered the opinions of plaintiff's treating physicians, the medical examiners who assessed plaintiff for the Workers' Compensation Board and Social Security Administration, plaintiff's medical records, and plaintiff's testimony.[15] (*Id.* at 615-18.) The ALJ gave the greatest weight to the opinions of the two medical examiners, Drs. Levin and Andrews-Watson, in light of the fact that these opinions were "based on a complete physical examination." (*Id.* at 617-18.) Both Drs. Levin and Andrews-Watson found that plaintiff could work, but with limitations. (*Id.* at 617 (discussing Dr. Levin's opinion that plaintiff could work "with lifting no greater than ten pounds and no climbing"); *id.* at 618 (discussing Dr. Andrews-Watson's opinion that plaintiff "has no restrictions for sitting; mild restrictions for prolonged standing, pushing, pulling, climbing, walking, lifting, and carrying heavy objects").) The ALJ gave

---

[15] The ALJ noted in his ruling that plaintiff testified regarding his chronic back pain, shoulder pain, and over-the-counter medications he took to treat his pain. (AR at 616.) The ALJ also noted plaintiff's physicians' findings, including, among others, Dr. Pastuch's reports that plaintiff had loss of motion in the thoracic spine, positive head compression test, numbness and tingling in the arms, and stiffness of the cervical and thoracic spine (*id.* at 616); Dr. Rafiy's findings that plaintiff had mid-thoracic and cervical tenderness, loss of motion, muscle spasms, and right shoulder tenderness (*id.* at 617); and Dr. Levin's impression that plaintiff had cervical, thoracic, and lumbar spine sprain, and could work with lifting no greater than ten pounds and no climbing (*id.*). The ALJ discussed these symptoms and diagnoses along with other factors plaintiff identified, such as plaintiff's treatment with anti-inflammatories and physical therapy. (*Id.* at 616.)

While taking into account this evidence of plaintiff's pain, the ALJ also noted that plaintiff reported to Dr. Pastuch at several office visits that he was experiencing a pain level of only three or four out of

ten. (*Id.*) The ALJ also found Dr. Andrews-Watson's opinion—which concluded that plaintiff had only some mild restrictions—to be "more consistent [with] the substantial evidence of record" than Dr. Pastuch's opinion that plaintiff had a temporary impairment. (*Id.*) The ALJ noted that Dr. Andrews-Watson "observed that [plaintiff] appeared to be in no acute distress, had a normal gait, could walk on heels and toes without difficulty, squat fully and used no assistive devices." (*Id.* at 618.) The ALJ also noted Dr. Andrews-Watson's discussion of plaintiff's activities of daily living: plaintiff reported that he was "able to cook four times per week, shop[] twice per week . . . shower, bathe, and dress himself every day, and likes to watch television, listen to the radio, and read." (*Id.*) Finally, as discussed above, the ALJ accorded significant weight to Dr. Andrews-Watson's opinion that plaintiff had "no restrictions for sitting; mild restrictions for prolonged standing, pushing, pulling, climbing, walking, lifting, and carrying heavy objects" because it was based on a complete physical examination. (*Id.*)

little or less weight to Drs. Pastuch, Rafiy, and Bagshaw's[16] opinions, which included findings regarding plaintiff's temporary impairment, and "moderate" and "marked" "partial disability," because they were only "based on a temporary impairment."[17] (*Id.* at 616-17.) The ALJ explained that Dr. Pastuch's opinion was entitled to less weight because it was only based on a temporary impairment, then noted that "the opinion of the consultative examiner contained in exhibit 3F [Dr. Andrews-Watson's opinion] is more consistent [with] the substantial evidence of record. In addition, during several office visits, the claimant only reported a pain level of 3-4." (*Id.* at 616.)

In addition to discussing the treating physicians and medical examiners' opinions, the ALJ discussed his review of medical records, including those describing plaintiff's own reports of his complaints, the results of his MRIs, and his medical history, including shoulder surgery. (*Id.* at 616-17.)

The ALJ concluded that, based on the entire record, including plaintiff's testimony, "the evidence fails to support [plaintiff's] assertions of total disability until January 17, 2015." (*Id.* at 618.) As briefly noted *supra*, the ALJ explained further:

The residual functional capacity outlined above accounts for [plaintiff's] credible testimony supported by medical evidence of record, regarding vocational limitations that his condition would place on him. Although [plaintiff] suffers some limitation due to his impairments, and as a result, his

capacity to perform work is affected, the undersigned finds that [plaintiff] retains the residual functional capacity to perform the exertional demands of light work with limitations as stated above.

(*Id.*) After concluding this analysis of plaintiff's residual functional capacity, the ALJ determined that plaintiff had been unable to perform any past relevant work since the onset of his disability on March 5, 2012, because "[t]he demands of [his] past relevant work exceed the residual functional capacity." (*Id.*)

Moving to the final step of the five-step process, the ALJ determined that, although plaintiff was unable to perform any past relevant work after the onset of his disability on March 5, 2012, he was capable of performing other work from that date through January 16, 2015, before his age category changed to "an individual of advanced age." (*Id.* at 618-19.)

The ALJ explained that, prior to the established disability onset date, plaintiff was "an individual closely approaching advanced age." (*Id.* at 618.) The ALJ also noted that plaintiff "has at least a high school education and is able to communicate in English." (*Id.* at 619.) The ALJ then determined that, under the framework established by the Medical-Vocational Rules, the transferability of job skills was not material to the determination of disability prior to January 17, 2015 (when plaintiff's age category changed)[18] because, prior to this date, plaintiff would have been found "not disabled" whether or not he had

---

[16] Neither plaintiff nor defendant discussed plaintiff's treatment by Dr. Bagshaw in briefing their motions.

[17] The ALJ also included a brief summary of Dr. Jacobs's opinion in his ruling, but did not note how

much weight he accorded it or any conclusions that he drew on the basis of this opinion. (*Id.* at 616.)

[18] Plaintiff's age category changed on January 18, 2015, not January 17, 2015. *See supra* note 2.

transferrable job skills.[19] (*Id.*) From January 17, 2015 on, however, plaintiff had not been able to transfer job skills to other occupations. (*Id.*) The ALJ stated that the vocational expert's testimony supported this conclusion. (*Id.*)

The ALJ explained that, before plaintiff's age category changed to that of "an individual of advanced age," plaintiff could have performed jobs that existed in significant numbers in the national economy. (*Id.*) In determining whether a successful adjustment to other work could be made, the ALJ considered plaintiff's residual functional capacity, age, education, and work experience in conjunction with the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2. (*Id.*) The ALJ noted that, if plaintiff could not perform substantially all of the exertional demands of work at a given level or exertion, and/or had nonexertional limitations, the medical-vocational rules were to be used as a framework for decision-making, unless there was a rule that directed a conclusion of "disabled" without considering the additional exertion and/or nonexertional limitations.[20] (*Id.*) If plaintiff had solely nonexertional limitations, Section 204.00 in the Medical-Vocational Guidelines would provide a framework for decision-making.[21] (*Id.*)

Applying these standards to plaintiff's case, the ALJ explained that, if plaintiff had the residual functional capacity to perform the full range of light work before January 17,

2015 (before the change in his age category), Medical-Vocational Rule 202.14 directed a finding of "not disabled." (*Id.*) In plaintiff's case, however, the ALJ found that additional limitations impeded plaintiff's ability to perform all or substantially all of the requirements of this level of work. (*Id.*) To determine the extent to which plaintiff's limitations eroded the unskilled light occupational base, the ALJ asked the vocational expert whether jobs existed in the national economy for an individual with plaintiff's age, education, and a similar background. (*Id.* at 413-14, 619.) The vocational expert testified that, given all of these factors, plaintiff would have been able to perform the job requirements of representative occupations including usher, DOT 344.677-014, SVP2, light exertional level (22,700 jobs in the nation), counter clerk, DOT 249.366-010, SVP2, light exertional level (18,200 jobs in the nation), and sandwich board carrier, DOT 299.687-014, SVP1, light exertional level (9,200[22] jobs in the nation). (*Id.*)

The ALJ found that, pursuant to SSR 00-4p, the vocational expert's testimony was consistent with the information contained in the Dictionary of Occupational Titles. (*Id.* at 619.) Based on the vocational expert's testimony, the ALJ concluded that, considering plaintiff's age, education, work experience, and residual functional capacity prior to the change in his age category,[23] plaintiff was capable of making a successful adjustment to other work that existed in

---

[19] SSR 82-41 provides: "[T]ransferability will be decisive in the conclusion of 'disabled' or 'not disabled' in only a relatively few instances because, even if it is determined that there are no transferable skills, a finding of 'not disabled' may be based on the ability to do unskilled work."

[20] *See* SSRs 83-12 and 83-14.

[21] *See* SSR 85-15.

[22] The ALJ mistakenly wrote 900,200 jobs in the nation. (AR at 619.)

[23] The ALJ concluded that "prior to the established onset date of disability . . . . [plaintiff] was capable of making a successful adjustment," but he had already made clear in his analysis that he was discussing plaintiff's disability determination during the period from the alleged onset of disability through plaintiff's change in age category. (*See id.* at 620.)

significant numbers of jobs in the national economy. (*Id.* at 620.) The ALJ therefore determined that a finding of "not disabled" from March 5, 2012 through January 16, 2015 was appropriate under the framework of the Medical-Vocational Guidelines. (*Id.*)

The ALJ determined, however, that beginning on the date plaintiff's age category changed on January 17, 2015, considering his age, education, work experience, and residual functional capacity, there were no jobs that existed in significant numbers in the national economy that plaintiff could perform. (*Id.*) Therefore, by direct application of Medical-Vocational Rule 202.06, a finding of "disabled" was appropriate beginning on January 17, 2015. (*Id.*)

In sum, the ALJ found that plaintiff was not disabled under Sections 216(i) and 223(d) of the Social Security Act prior to January 17, 2015, but that plaintiff became disabled under these sections on that date, and continued to be disabled through the date of his decision. (*Id.*) He noted that the Workers' Compensation offset provisions at 20 C.F.R. 404.408 may be applicable. (*Id.*)

C. Analysis

As the ALJ determined that plaintiff was disabled beginning on January 17, 2015 through the date of his decision, plaintiff challenges only the ALJ's conclusion pertaining to the first period of his alleged disability, from March 5, 2012 through January 16, 2015. (ECF No. 17-1 at 1.) Plaintiff argues that the Commissioner did not meet the burden of proof required to show that he was capable of performing any other work that existed in significant numbers of jobs in the national economy. (*Id.*) Specifically, plaintiff argues that: (1) the Commissioner failed to properly evaluate the medical evidence from his treating physicians and the medical examiners, and

(2) the Commissioner failed to properly assess plaintiff's allegations of pain. As set forth below, the ALJ failed to provide good reasons for not crediting plaintiff's treating physicians and for assigning the weight he did to the medical examiners' opinions. Thus, remand is warranted, and the Court need not, and does not, address plaintiff's credibility argument.

The Commissioner must give special evidentiary weight to the opinion of the treating physician. *See Clark*, 143 F.3d at 118. The "treating physician rule," as it is known, "mandates that the medical opinion of a claimant's treating physician [be] given controlling weight if it is well supported by medical findings and not inconsistent with other substantial record evidence." *Shaw v. Carter*, 221 F.3d 126, 134 (2d Cir. 2000); *see also, e.g.*, *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999); *Clark*, 143 F.3d at 118. The rule, as set forth in the regulations, provides:

> Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairments(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.

20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). Although treating physicians may share their opinions concerning a patient's inability to work and the severity of the disability, the ultimate decision of whether an individual is disabled is "reserved to the Commissioner." *Id.* § 404.1527(d)(1); *see also Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999) ("[T]he Social Security Administration considers the data that physicians provide but draws its own conclusions as to whether those data indicate disability.").

If the opinion of the treating physician as to the nature and severity of the impairment is not given controlling weight, the ALJ must apply various factors to decide how much weight to give the opinion. *See Shaw*, 221 F.3d at 134; *Clark*, 143 F.3d at 118. These factors include: (i) the frequency of examination and the length, nature, and extent of the treatment relationship, (ii) the evidence in support of the opinion, (iii) the opinion's consistency with the record as a whole, (iv) whether the opinion is from a specialist, and (v) other relevant factors. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); *see Clark*, 143 F.3d at 118. When the ALJ chooses not to give the treating physician's opinion controlling weight, he must "give good reasons in his notice of determination or decision for the weight [he] gives [the claimant's] treating source's opinion." *Clark*, 143 F.3d at 118 (quoting C.F.R. §§ 404.1527(d)(2), 416.927(d)(2)); *see also Perez v. Astrue*, No. 07-cv-958 (DLI), 2009 WL 2496585, at *8 (E.D.N.Y. Aug. 14, 2009) ("Even if [the treating physician's] opinions do not merit controlling weight, the ALJ must explain what weight she gave those opinions and must articulate good reasons for not crediting the opinions of a claimant's treating physician."); *see also Santiago v.*

*Barnhart*, 441 F. Supp. 2d 620, 627 (S.D.N.Y. 2006) ("Even if the treating physician's opinion is contradicted by substantial evidence and is thus not controlling, it is still entitled to significant weight because the treating source is inherently more familiar with a claimant's medical condition than are other sources."). A failure by the ALJ to provide "good reasons" for not crediting the opinion of a treating physician is a ground for remand. *See Snell*, 177 F.3d at 133; *Halloran v. Barnhart*, 362 F.3d 28, 33 (2d Cir. 2004) ("We do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physicians opinion and we will continue remanding when we encounter opinions from ALJ's that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion.").

Here, remand is appropriate because the ALJ failed to give "good reasons" for according less than controlling weight to the opinions of plaintiff's treating physicians,[24] and for according greater weight to one of the two medical examiners' opinions. More generally, although defendant has supplied justifications for the ALJ's rejections of the different physicians' opinions, those explanations were absent from the ALJ's brief, dismissive statements.

First, the ALJ gave little weight to plaintiff's treating physicians' opinions on the ground that they were "based on a temporary impairment" or disability.[25] (AR at 616-17.) Defendant argues that the ALJ rejected these doctors' opinions to the extent that they served as opinions on issues reserved to the Commissioner regarding plaintiff's disability determination, rather

---

[24] The ALJ discussed the opinions of plaintiff's treating physicians, Drs. Pastuch, Jacobs, Rafiy, and Bagshaw. (AR at 616-17.)

[25] The ALJ made the same statement with regard to Drs. Pastuch, Rafiy, and Bagshaw's opinions.

than pure medical opinions. (ECF No. 22 at 15.) The Court notes that the ALJ did not, as defendant suggests, cabin his decision to accord little weight to these opinions to the portions of the opinions classifying plaintiff as impaired or disabled. In each case, the ALJ wrote that he accorded little weight to the doctor's opinion without any qualification. (*See, e.g.*, AR at 617 ("The undersigned accords little weight to the opinion of Dr. Rafiy as it is only based on a temporary impairment.").) The ALJ did not state that he was still taking into consideration all of the other assessments that he noted each doctor had made with regard to plaintiff's complaints, symptoms, objective medical conditions (such as diagnoses based on his MRIs), and other relevant factors. After stating that he accorded less weight to Dr. Pastuch's opinion, the ALJ briefly noted that, at several visits, plaintiff had "only reported a pain level of 3-4" to Dr. Pastuch. (*Id.* at 616.) It is not clear, however, that the ALJ found this factor alone to outweigh all of the other conditions Dr. Pastuch had discussed and therefore justify giving Dr. Pastuch's opinion, as a whole, little weight. Further, the ALJ did not provide similar potential explanations for according little weight to the other treating physicians' opinions. Finally, at a more fundamental level, the ALJ did not explain why a treating physician's opinion regarding a temporary impairment should be discounted, or why he determined that the treating physicians' opinions regarding plaintiff's impairment or disability—based on the evidence before them—should lead him to accord little weight to these opinions overall.

Second, defendant furnishes another possible explanation for discounting Dr. Pastuch's opinion that the ALJ never provided as a reason for his ruling: defendant argues that Dr. Pastuch's opinion "was not entitled to any deference because he was a chiropractor." (ECF No. 22 at 16.)

Defendant explains that Dr. Pastuch's opinion did not qualify as a medical opinion because "a chiropractor is not considered an acceptable medical source." (ECF No. 22 at 16.) As plaintiff points out, however, the ALJ never stated that he accorded Dr. Pastuch's opinion little weight because he was a chiropractor. In any event, the Social Security Rules allow ALJs to take opinions of "other" medical sources into consideration. *See* 20 C.F.R. § 404.1527 ("Depending on the particular facts in a case, and after applying the factors for weighing opinion evidence, an opinion from a medical source who is not an acceptable medical source or from a nonmedical source may outweigh the medical opinion of an acceptable medical source . . . ."). The Court, therefore, finds defendant's argument that the ALJ discounted Dr. Pastuch's opinion on this basis unpersuasive.

Finally, the ALJ did not explain why he accorded only "some" weight to independent medical examiner Dr. Levin's opinion (AR at 617), while according "significant" weight to consultative examiner Dr. Andrews-Watson's opinion (*id.* at 618). Based on the ALJ's own explanation, these opinions should have been given the same amount of weight: for Dr. Levin's, he "accord[ed] some weight to the opinion as it is based on a complete physical examination" (*id.* at 617); for Dr. Andrews-Watson's, he "accord[ed] significant weight to the opinion of the doctor as it is based on a complete physical examination" (*id.* at 618). The ALJ provided no further explanation and, thus, it is unclear what led him to weight these opinions differently. The ALJ's failure to provide good reasons for this decision is significant because these doctors' opinions differed as to what limitations on plaintiff's work they found necessary. Dr. Levin found that plaintiff "could work with lifting no greater than ten pounds and no climbing" (*id.* at 617), while Dr. Andrews-Watson determined that

plaintiff had "no restrictions for sitting; mild[26] restrictions for prolonged standing, pushing, pulling, climbing, walking, lifting, and carrying heavy objects" (*id.* at 618). Defendant argues that the ALJ "justifiably" accorded greater weight to Dr. Andrews-Watson's opinion because she assessed plaintiff in the Social Security context, whereas Dr. Levin assessed plaintiff in the Workers' Compensation context, "which involves entirely different criteria than DIB claims." (ECF No. 22 at 20.) As with defendant's other arguments, this potential justification for the ALJ's decision is absent from the ruling itself.

The Court, therefore, concludes that the ALJ's discussion of the two medical examiners' opinions did not include "good reasons" for giving more weight to Dr. Andrews-Watson's opinion than Dr. Levin's opinion. Additionally, both Drs. Levin and Andrews-Watson examined plaintiff only once, but the ALJ failed to provide an explanation as to why their opinions should be accorded greater weight than those of the physicians who treated plaintiff many times over the course of years.[27] The Second Circuit had made clear that "ALJs should not rely heavily on the findings of consultative physicians after a single examination."

*Selian*, 708 F.3d at 419. In *Selian*, the ALJ rejected the opinions of physicians who "performed only one consultative examination." (*Id.*) The Court held that, in doing so, the ALJ failed to "provide 'good reasons' for not crediting [the treating physician's] diagnosis," and that failure "by itself warrant[ed] remand." *Id.*; *see also Cruz v. Sullivan*, 912 F.2d 8, 13 (2d. Cir. 1990) ("[A] consulting physician's opinions or report should be given limited weight . . . because 'consultative exams are often brief, are generally performed without benefit or review of claimant's medical history and, at best, only give a glimpse of the claimant on a single day.'" (citation omitted)); *Santiago*, 441 F. Supp. 2d at 628-29 (holding that the ALJ erred in giving consulting physicians' opinions controlling weight over those of the treating physicians). By crediting the opinions of the medical examiners over those of the treating physicians, the ALJ here committed the same error as the ALJ in *Selian*, especially in light of the ALJ's failure to give "good reasons" for not affording more weight to the treating physicians' opinions. 708 F.3d at 419; *see also Cruz*, 912 F.2d at 13; *Santiago*, 441 F. Supp. at 630.

In sum, the ALJ did not articulate "good reasons" for providing little weight to the

---

[26] On remand, the ALJ should assess if the term "mild restrictions" is too vague in light of other evidence on the record, and if it requires follow-up with Dr. Andrews-Watson.

[27] The Court also notes that, although the ALJ stated that Dr. Andrews-Watson's opinion was "more consistent [with] the substantial evidence of record" than Dr. Pastuch's opinion, the ALJ made this conclusory statement with no explanation, other than possibly the fact that plaintiff stated at several visits with Dr. Pastuch that his pain level was a three or four out of ten. (AR at 616.) The record also shows, however, that at numerous visits from March 2012 through the date of the change in his age category, plaintiff reported to Dr. Pastuch that he was experiencing a pain level ranging from five to nine out of ten. (*See, e.g.*, *id.* at 267, 372-73, 603-07.)

Other evidence in the record could also undermine the ALJ's determination that plaintiff was capable of performing other work during his first alleged period of disability. At the second administrative hearing, for instance, the ALJ asked the vocational expert to list representative jobs that plaintiff could perform in light of his limitations, and appeared dissatisfied with the vocational expert's answer. (*See id.* at 414.) The vocational expert provided three jobs, including a sandwich board carrier, and the ALJ—after clarifying what that position entailed—asked the vocational expert to provide another example of work that plaintiff could perform. (*Id.*) The vocational expert replied that there was no other such job, given plaintiff's residual functional capacity. (*Id.*)

treating physicians' opinions, *Snell*, 177 F.3d at 133—which "by itself warrants remand,"[28] *Selian*, 708 F.3d at 419—or for the weight he accorded to the medical examiners' opinions.

### V. CONCLUSION

For the reasons set forth above, plaintiff's motion for judgment on the pleadings is denied. The Commissioner's motion for judgment on the pleadings is also denied. The case is remanded to the ALJ for further proceedings consistent with this Memorandum and Order.

SO ORDERED.

JOSEPH F. BIANCO

United States District Judge

Dated: February 26, 2018
      Central Islip, New York

\*\*\*

Plaintiff is represented by Terry I. Katz of Terry Katz & Associates, P.C., 900 Merchants Concourse, Suite 210, Westbury, New York 11590. The Commissioner is represented by Assistant United States Attorneys Candace Scott Appleton, Prashant Tamaskar, and Robert W. Schumacher, II of the United States Attorney's Office, Eastern District of New York, 271 Cadman Plaza East, 7th floor, Brooklyn, New York 11201.

---

[28] In light of this Court's ruling that the ALJ committed legal error by failing to give "good reasons" for rejecting the opinions of Drs. Pastuch, Rafiy, and Bagshaw, the Court need not address plaintiff's other arguments. The Court, therefore, declines to do so but directs the ALJ on remand to reconsider plaintiff's testimony and credibility after properly applying the treating physician rule. *See McAllister v. Colvin*, No. 15-CV-2673 (JFB), 2016 WL 4717988, at \*14 n.3 (E.D.N.Y. Sept. 9, 2016); *Morris v. Colvin*, No. 15-CV-5600 (JFB), 2016 WL 7235710, at \*10 (E.D.N.Y. Dec. 14, 2016).